All right, we will now hear the case of Richard Alexander Williams v. First Advantage Background Your Honors, Thomas Piskorsky on behalf of Defendant Eppley, First Advantage. If I could begin with the willfulness issue that's addressed in the briefs initially. Safeco Insurance sets a very high bar. I'm sorry, Your Honor, can you ---- The acoustics here are not great. I'm having trouble understanding words. Are you? It's very muffled. It's not the advocate's part. So maybe I'm having a lot of trouble. Is this better? That's better. That is better. Yes. Okay. What did you do? We need to do that tomorrow. I took this thing off and put it back in. I'll try to speak more directly. You can come back in the morning. It's not your fault. It's our equipment. So on the willfulness issue, Safeco Insurance sets a high bar for the finding of willfulness under the Fair Credit Reporting Act. The standard, the operative standard, is reckless disregard. The two components of that are an unjustifiably high risk of harm. The second component is it's either known or obvious that it should be known. We don't believe the evidence viewed in the light most favorable to the plaintiff satisfies that bar. First advantage fully recognizes its rights and, more importantly, its obligations under the Fair Credit Reporting Act. We believe our procedures and our track record, our performance record, make that crystal clear. With respect to procedures, Defendant's Exhibit 12 lays out the entire protocol. I'd like to highlight two components of that. One is the enhanced identification procedure for common name situations. This is not a case where a consumer reporting agency recognized that common names present some complications or complexities and ignored it. First advantage recognizes those complexities and complications and adopted an enhanced procedure to address it. Admittedly, they were not followed, and that's why the negligence finding is sustainable. But we're talking about willful disregard of the law. Just because- Well, what about instead of willful, reckless? Not in this case. There's no evidence of recklessly not following a procedure. For failing to follow your own internal procedures. Agreed, Judge. Someone dropped the ball. That's what the record shows. That's what first advantage admitted at trial. But there's a big leap to taking that and converting it into you willfully disregarded the law. You knew that you were violating the law. Well, maybe we would spot you on the first one, on the first instance where there's a problem. But then when it was known that Richard Williams was not the felon, Ricky Williams, then once again there was nothing put in the file or some way to note the next person that that was going to happen. And then once again, the ball got dropped. Now a second time. At what point do we find you to be reckless under these kind of circumstances? Except factually with respect to that, the adjudicator in that case actually went an extra step to review actual court files. So it- And that was even worse, right? Well, even- I mean, because obviously this guy wasn't applying for a job if he was sitting in jail, right? Well, they were confirming certain records. The adjudicator didn't evaluate certain information. But again, Your Honor, that's dropping the ball, not willfully disregarding the law. Let me ask you about that. So Matthew O'Connor is who? What position? He's an executive with first advantage, Your Honor. All right. And he testified at trial? He did. So I was looking at his testimony and he was asked, there was a conscious decision not to use Experian in these cases. And he said, that's right. That's correct. There was a conscious decision not to use Experian. I mean, how is that not willful? Well, they didn't use the address history part, but they went out to validate the remainder of the information that the criminal records report was suggesting. And under the policy, the intent would be to develop a third identifier to the extent one is available and can be located. But the supervisor can waive that. Again, there's no evidence in the record as to exactly what happened. But there's no evidence in the record that anyone said, I want to submit this inaccurate match to Winn-Dixie. But that's not required. That would be, you know, malicious intent. I agree with you. Reckless is a hard standard. The dividing lines between negligence and reckless, that can be hard. But the jury decided that it was reckless. Yeah. But for the second one, Your Honor, if the adjudicator didn't happen to look at certain information, that's negligence. I'll concede that for purposes of this argument. But something more has to be required than simply not following what the procedure said should be done. What if you don't follow it ten times? Well — Is that reckless? You might be getting there depending on the circumstances. But the other critical part of the undisputed record, the stipulated record, is the performance record of first advantage. The highest level of disputes is 0.4 percent. That didn't do Mr. Williams much good, did it? Of course, Your Honor. Mr. Williams, we regret it. Of course — Well, the problem, though, with that analysis, though, is, I mean, what I would be interested in, not just the total error rate, but if you wanted to have a more precise error calculation, it would be how many cases have we had with common names? And once you get that group, how many cases with common names did we attribute a felony to one of these folks? And how many times was that wrong? That would be a more interesting statistic. Agreed, Your Honor. In fact, the 0.4 dispute rate percentage that's stipulated really probably is an overstatement of, quote, errors, because that is simply dispute and the revised — I'm sorry, the revised report rate of 0.4. So 99.6 percent of the time, no reports are revised. But there's no evidence on that 0.4 of revised reports. There's no evidence of the actual reason why the report was revised. There's no evidence that it was revised because of some action or inaction taken by first advantage. No evidence of that. There's no evidence, to your question, Judge Carnes, about how many of those were actual common name problems. There's not a single case other than Mr. Williams. And, again, I'm not minimizing Mr. Williams. Of course he was hurt here in terms of losing job opportunities. But we have to look at the overall context. And there's no evidence that there's been any other common name problem like Mr. Williams. And certainly there's no evidence that the reasons associated with Mr. Williams' mismatches — Oh, there's been no evidence that this ever happened with any other common name, as far as we know, this is the only time it ever happened? In this record, that is correct, Judge. And that's the evidence. You — the district court said, well, I think there must have been, but there's no evidence of that. It's the plaintiff's burden, especially when we're talking about something as significant as willful disregard and — excuse me — reckless disregard and willfulness and punitive damages. The plaintiff should have presented evidence that that 0.40 revised report rate happened to common name situations. Happened for the same reasons that affected Mr. Williams. Happened because of some inadequacy about cross-blocking versus case-blocking. Some — happened because of address history. There's not a single case in the record where failing to look at an address history somehow contributed or caused a mismatch to the ultimate prospective employer. The number's there. The number's powerful. 0.40 revised report rate. 99.6 percent of the time a criminal background report stays exactly as it is. And with respect to the 0.40, there's multiple, multiple potential reasons having nothing to do with first advantage. We're talking about criminal information. I don't — we don't know the accuracy of what's coming from the courthouses, the accuracy of what's coming from the — No, but you knew in this case. I mean, I don't blame you for wanting to talk about statistics, but you knew in this case that your report to the first employer had caused Mr. Williams problems. It took, you know, whatever time it took to work that out. He doesn't get hired for them, for Renison or whatever. And then it happens again. I mean, you're on notice. Let me just correct you, just so the record is clear. It didn't happen again. A mismatch happened for Mr. Williams. But the criminal record that was the problem in the Rent-A-Center report was taken out and was not part of the Winn-Dixie. Well, so you come up with another one that doesn't belong to him. I mean, how is that not happening again? Well, it shows that we're trying to be sensitive. Maybe not perfect, but — I mean, the idea is, were our procedures reasonable in place at the time? We think, based on the content of the procedure and the statistics, it was. Nothing was telling us — I don't understand how you can talk about these procedures. What was the procedure? With respect to common name situations, the procedure was, in Defendant's Exhibit 12, additional attempts must be made to obtain a third identifier. But then in the same token, you've got your executive testifying. People weren't allowed to check Experian. Well, no, they were. And there's no evidence that, in Mr. Williams' case, anybody was prohibited or limited from seeking address history information. The idea that, had we looked at address history, something would have happened differently — not necessarily. Address history from the procedure — Well, he was in jail. Well, at that time — yes, no question. But at that time, we're talking about a 2004 conviction that appeared at that time, not a conviction that was occurring at the time the report was generated. It was a 2004 conviction that appeared on the Winn-Dixie report. It was a different conviction that appeared on Rent-A-Center, and that conviction was removed pursuant to policy, to pursuant to our procedures, so it didn't appear on the — We've talked about this a lot. Maybe we're beating this dead horse. You're interested in punitive damages, I gather. It's a lot of money. Maybe you can talk to us about that. In fact, Your Honor, if I could do reputational injury because it goes directly to punitive damages, and for this reason, it's an important appeal issue because of the consequences if the evidence does not support reputational harm. If the evidence does not support reputational harm, then the compensatory damages must be vacated. But you didn't ask for a jury. You — didn't you agree to the verdict form that didn't require segregating out the various types of harm? Correct. But under this Court's decision in Richards-Michelin, we didn't have to because the instructions specifically advised the jury you can award back pay, you can award — I think emotional anguish were the exact terms — and reputational harm. So if any one of those elements is not supported under your court — under your verdict goes out, even if we didn't object to the verdict form. The objection was not required. That's what Michelin says. And in this case, the evidence of reputational harm doesn't exist, in our view. No person testified about Mr. Williams' — All right. So if you're right about — I'm sorry. Go ahead, Judge O'Keefe. I was going to say, assume, just for the sake of argument, that the $250,000 compensatory stands. What should the multiplier be? It was 13.2, as I understand. What would you recommend to be the appropriate multiplier and why? Well, I think it has to get down to single digits. I think it actually should be remanded for a new trial on punitive damages, because right now that award is too excessive. But, Judge, the critical point is the entire punitive damages award goes out if the court finds the evidence insufficient to support — Assume we're not going to accept that argument. You've got 50 seconds. If I were you and I were the big-ticket item, here's the punitives, I'd be talking about punitives. That's just me. The ratio that the plaintiff was using to defend it is 6-to-1. We think a 1-to-1 ratio would be at the top limit of this, at the top, because of the substantial amount of compensatory damages. The $250,000 reflects a punitive element. That's what State Farm talked about. So the idea of going beyond even a 1-to-1 ratio, it seems to us to be indefensible under State Farm. Is there any evidence of where the $250,000 came from? The evidence is the back pay amount was calculated at approximately $77,000, Your Honor. The remainder of the $250,000, I do not believe the record reflects any kind of determination or calculation as to that amount. The emotional injury was very vague, I shouldn't say vague, very generalized in terms of loss of appetite and difficulty sleeping. That was the extent of the non-back pay. And we obviously don't know what the jury said for reputational injury, though our position is no evidence supports reputational injury. In fact, the evidence supports it didn't happen. He got a job with the Levy County Sheriff's Office after the first report. So a law enforcement agency was obviously not finding anything with Mr. Williams' reputation that would negatively affect his ability to do the job. And plaintiff testified that his reputation and his father's contributed to that. And secondly, he got the Winn-Dixie job, the very entity that received the report. So there's just no reputational injury. Thank you, Your Honors. Thank you. Good morning. Good morning. May it please the Court. I'm Barry Balmuth along with co-counsel Michael Massey on behalf of Richard Williams. Counsel made... You talk a little closer because it's getting muffled again. Sorry. I'm sorry. No, you're tall. That's difficult. Yeah. Counsel made a couple misstatements. I'm not suggesting that was intentional. Unlike me, I was the lead trial counsel. He was not. So he might not be familiar with the facts as I am. When he talks about the error rate, that's not... Before we get into that, which is complicated because our mind's on this reputational, could you just segue quickly? Your opponent, it seems to me he has a decent argument that there was very little evidence for reputational damage. And he argues, if that's so, that we have to remand this whole case to redetermine compensatory damages. And he cites an 11th Circuit case saying it's not required that he request a verdict form that segregated out the particular types of damages. What do you say to that argument? Well, I'll say this. The Fair Credit Reporting Act is all about reputation. If you look at the definition of a... But what about his argument that if there's a flaw in that verdict form, if you had three types of damages and the jury wasn't asked to allocate a monetary amount to each type and it turns out one falls, the reputational part is kind of weak, what do we do with that? Well, that's interesting because in their judgment for a matter of law, they said that the jury awarded $78,000 for lost pay, which is what I argue they should award, and $170,000 change for emotional distress. They attribute none of it to reputational damages. So they're speaking inconsistently. But you have to go back to what the Fair Credit... It's not... But you're not answering my question. It's just a general law question. What do we do with that? Do you disagree with him that we have to send it back because if we find one of these areas of damages fail? First of all, he's asked for a new trial, and I believe the standard is when you ask for a new trial, it's clear abuse of discretion. I think there was sufficient evidence on reputational damages. But if you were to do something about the reputational damages, I'm going to answer your question, and then I'd like to supplement it, then you could certainly remit the damages going by their own motion for judgment as a matter of law in which they attributed the jury verdict to lost wages and emotional distress only. That's at pages 9 and 19 of their motion. There was nothing they thought was attributed to reputational damages, so I don't think it needs to be remitted. But let me tell you why there was sufficient evidence of reputational damages within the meaning of the Fair Credit Reporting Act. If you follow counsel of first advantages theory, then every time you want to prove reputational damages, you have to bring in a parade of people to say, well, I heard Richard Williams was a criminal. That goes against what the Fair Credit Reporting Act requires, which is when a consumer report is promulgated and submitted, it can only be submitted to a certified user with a certified permissible purpose. So a consumer reporting agency, be it a background reporting agency or credit reporting agency, they can't put in the papers. They can only submit it to the employer or the lender, what have you, or the landlord that's asking for the report and only for a specific purpose. So under first advantages theory, you would never have reputational damages under the Fair Credit Reporting Act, yet that's what the whole report, the whole Fair Credit Report, not the whole thing, but that's certainly a major facet. If you look at the definition of a consumer report in the Act, it talks about reports having to do with character and so forth. Here, they submit a report saying Richard Williams is a criminal, first time saying that he was charged with the sale of cocaine and there was a bench warrant out for him based on a 2012, not, he had the, counsel had the crimes mixed up. It was a 2012 charge in the first report. It was a 2004 conviction for burglary and battery on a pregnant woman. He submitted that, they submitted that to the folks who mattered most to Mr. Williams, perhaps after his family, at that moment in his life, the folks he was trying to get a job with. If that's not damage to a reputation with those people, I don't know what is. The jury found that that caused him not to get the job. The case they cite in the brief, the Stewart case, had to do with damage to the reputation of a business and the court found there was not sufficient evidence because the plaintiff didn't show that the remarks, what was said about the business, caused economic damages. This is about reputation of a person. That's an intangible. But even if you did require... Let me, just to be sure I've got the record right on this. I mean, when you made your argument to the jury at the end of the case, you asked, you gave specific numbers for lost wages, a specific number for emotional distress related to the first incident, Rent-A-Center, and you gave an amount for emotional damages related to the Winn-Dixie error. So, I mean, you didn't have to ask for reputational damages, did you? I mean, the jury just said, okay, we think this is the right amount based on lost wages and emotional distress alone. That's okay under the statute, isn't it? That's correct, Your Honor, and it was not a feature of my argument. We didn't bring in a parade of people, and we don't have to. Otherwise, you can never have reputational damages. But again, even first advantage attributed mostly to emotional distress. In addition to what counsel said, he also had headaches that he had to take, albeit over-the-counter medications for. So that was clearly the feature of the case, not the reputational damages. But nevertheless, we think that there's no reason. The judge did not clearly abuse his discretion. There's no reason for a new trial. Your opposing counsel said that, as to the willfulness part, which he spent a lot of time talking about, essentially, as far as the record shows, this was a one-off, that your client may be a two-off because two things happened to him, that there's nothing in the record to suggest anything like this has ever happened before. So management wouldn't have been on notice to say we need to correct our procedures or people aren't following our procedures. What's your response to that argument? Well, if that's accurate, Your Honor, then why do they have special procedures for common names? They obviously recognize that when you're dealing with common names, there's a greater risk involved of there being two identities. But what he's saying is they only, this is just one time. Obviously, you have a procedure as an employer, and people aren't following it, and you're on notice of that, then you need to take action. He's saying there's no indication there have been any problems. Management didn't even know that they had to take any corrective action. Well, there were 14,000 people. And by the way, he made a misstatement. It was not the error rate, not the overall error rate or dispute rate for background reports. It was only for not-me, 0.4 is only for not-me errors, which, in their jargon, is an error where somebody gets a background report and he sees somebody else's public records in the background. That's the only kind of, the judgment let us discover their overall error rate. So I have no idea what their dispute rate. There could be all kinds of other errors. I can give you hundreds of examples, but just a real quick one. The district court would not allow you to discover their overall dispute rate? That's correct, Your Honor. And I assume that was invited by them. They objected to you doing that. Absolutely. In fact, they only wanted us to discover the rate in Florida, or they only provided we had to move to compel to get the national rate. So nothing you can do about, it's necessarily one-off because they didn't want you to find out any other information that would suggest it was anything else. Well, I know there's 14,000 not-me errors. A modicum of common sense says that it's highly unlikely that there's going to be two Barry Balmas born on the same day. But there's a lot of Richard Williams. I can think of a couple that are famous. Ricky Williams, the football player. Richard Williams, the father of Venus and Serena Williams. So it's not surprising that there's two Richard and Rickies born on the same day. And they knew that. They knew that because they had a special procedure. They recognized the risk. But the Fair Credit Reporting Act says you have to, you can't just put a procedure in the manual. You have to follow the procedure whenever you prepare a background report. And they didn't do that. And it's more than just intentional. And it was more than just consciously in these two particular circumstances. They purposely limited the amount of people that could use the address history procedure because they limited the amount of people that they got a license for from Experian. And interestingly, when there was a dispute, they did go ahead and get an address history after the second dispute. So they know it has value. It's in the procedures. But they just wrote it down. They don't follow it. And 14,000 people with errors, we know if you use a smidgen of common sense, the logical inference is that a lot of those folks have common names. Because that's how somebody, somebody's, you get these mixed file cases where somebody's records gets into somebody else's background report. How about punitive damages? Well, here's the thing. The Goldsmith case from the 11th Circuit is very similar. In some ways, it's more reprehensible because it was an intentional act. In some ways, it's less reprehensible because they didn't do it to 14,000 folks. They did it to three or four folks. And in that case, they said, in the 11th Circuit said, hey, when you have these kinds of physical symptoms of emotional distress, that qualifies under the first factor for reprehensibility. Here we're talking about a young man who is deprived of making a living for almost two years. Well, we're not, when we get to punitives, the compensatory takes care of his individual situation. My understanding is punitives is something separate, which is we look at what has to be reprehensible conduct. And it's an effort to punish and send a message to the company, regardless of this particular individual. 13 to 1 is pretty high for a case where there's at least an argument. Willfulness is not a slam dunk. And the Supreme Court has indicated to us, you know, single digits is sort of the presumptive level. So I need some help from you in telling me why we should sustain this kind of differential in the punitives. Well, I respectfully suggest to you, Your Honor, that there's 14,000 reasons to affirm the order and judgment. That's 14,000 folks who would, you know, there was a situation a few months ago with General Electric, where they laid off 12,000 people. And it made the headlines, it was on every news channel. Well, here you have 14,000 people nationwide over a five-year period that are either delayed or denied employment, denied a livelihood. And it affects not only those 14,000 people, but if any of those folks had families, it affects their families. That affects your ability to buy food and groceries, your ability to buy medicine, their ability. If you don't have medicine, you don't have health and safety. So it affects a broad range of folks. Counsel, may I, counsel? Sorry. I'm over here. I'm sorry. May I ask, if we are not persuaded by your argument on punitives, do we have the authority to reduce the amount to a particular amount that we're satisfied with? Or would it be mandatory that we have to send it back for reconsideration by the district court on the punitives? You know, I don't know the answer to that question, Your Honor. The other thing I would add is that if you add in attorney's fees and there was a bond posted, which I think is a tacit acknowledgement that the attorney's fees will be significant. It was a $4.1 million bond. So the attorney's fees are in the neighborhood of half a million. I know the judge deferred it until after the appeal. But if you add the attorney's fees, something in that neighborhood, the ratio could be as low as 6 to 1. And there's cases... Are we supposed to add attorney's fees to the determination? Well, there's cases going back and forth, different cases we cited in the brief. There's cases going different ways on that. In the Miller case, they also cited, I think it was a Third Circuit decision where they did consider attorney's fees. They decided not to include attorney's fees in the ratio. But it is part of compensation. And I think they should be considered, at least in part. I see my time is up. I thank you for your time. And we ask, of course, that the order in judgment be affirmed. Thank you. At the end of the day, the record evidence doesn't reflect any other common name mismatch other than the two instances with Mr. Williams. But that may be because in discovery, you successfully prevented them from learning about such other matches. I don't recall the exact discovery record, Your Honor. But nothing would prevent Mr. Williams from asking a district court, at least let us take discovery to see if there's other problems like those that affected Mr. Williams. But in terms of a trial record, and that's all we've got to look at. But you understand we can't hold it against him that he didn't prove a particular fact if your side successfully prevented him from learning that fact. He had the company people on the witness stand. He could have asked them all kinds of questions about common name problems that existed in the past and how come he didn't act on them. He didn't do that. With respect to attorney's fees, Judge Carnes, the Fair Credit Reporting Act makes clear attorney's fees are recoverable, but they are not part of compensatory damages. Two entirely different provisions in the statute. You can't include attorney's fees as part of compensatory damages, especially in this case. It has no amount has even been set for attorney's fees. So how can anyone consider the amount of attorney's fees to determine the appropriate ratio? And we're persuaded by your argument that the ratio should be closer to one-to-one, let's say. Can we decide that here or would we have to remand it to the history court? My recollection, Your Honor, is there are cases that say that you do have that authority. And my last comment — You're saying we can do it rather than send it back to the history court? Yes. My last comment to kind of lock this in on the willfulness, our view is I don't see how this finding of willfulness can be squared. Granted, it's the Sixth Circuit, but its decision in Smith, but more importantly, this decision in Collins. Facts in Collins, much worse, and the finding was no willfulness there. I think Collins dictates a reversal of willfulness here. Thank you. Thank you very much. That concludes our arguments for the day. We will be in recess until 9 o'clock tomorrow morning. Thank you.